UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Mark S. Bowers,

      Plaintiff,

  v.

Life Insurance Co. of North America,

      Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-891 ADM/JJG

_____

Denise Yegge Tataryn, Esq., Brian R. Christiansen, Esq., and KrisAnn Norby-Jahner, Esq., Hellmuth & Johnson PLLC, Edina, MN, on behalf of Plaintiff.

Daniel K. Ryan, Esq., and Michael T. Berger, Esq., Hinshaw & Culbertson LLP, Chicago, IL, and Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On March 7, 2014, the undersigned United States District Judge heard oral argument on Plaintiff Mark S. Bowers's and Defendant Life Insurance Co. of North America's ("LINA") cross-motions for summary judgment [Docket Nos. 22, 28].  The parties dispute whether Bowers is eligible for a life waiver of premium benefit under a plan administered by LINA.[1]  For the reasons set forth below, Bowers's motion for summary judgment is granted and LINA's motion for summary judgment is denied.

## II.  BACKGROUND

**A.  Employment with C.H. Robinson**

Plaintiff Bowers began working for C.H. Robinson Worldwide, Inc. ("C.H. Robinson") on March 1, 1996, and eventually reached the position of Corporate Sales Director.  Michael T.

---

[1] LINA is also referred to as "CIGNA" in the administrative record.

Berger Aff. [Docket No. 25] Ex. 1 ("Admin. Record") at 509.[2]  On December 26, 2007, Bowers stopped working due to coronary artery disease.  Two days later, on December 28, 2007, Bowers underwent emergency quadruple bypass surgery.  See id. at 910, 1479.  Bowers's recovery was arduous and prolonged.  He suffered from a staph infection requiring four or five debridement operations, and underwent extensive physical therapy.  Id.

On June 27, 2008, Bowers returned to work.  Bowers and C.H. Robinson agreed Bowers would return at a lower position, that of Consulting Services Manager.  Bowers received the same salary as before but his potential for earning bonus compensation was significantly reduced.  Bowers also agreed to a reduced work schedule with the goal of increasing his hours to full-time.  Id. at 1214.

Approximately one year later, on June 13, 2009, Bowers again left his employment due to health concerns.  In August 2009, Bowers underwent a "total sternal reconstruction procedure," as well as a muscle flap reconstruction involving his pectoralis muscles.  Id. at 910.  Bowers did not return to employment.

Also in August 2009, Bowers applied for long-term disability ("LTD") benefits under the benefits plan administered by LINA (the "Plan").  In his application for benefits, Bowers's former counsel wrote that C.H. Robinson had accommodated Bowers's disability by moving him to a "staff consultant" position.  Counsel also wrote that Bowers had been able to work only "about 25 hours per week due to his ongoing disability."  Id. at 1196.  In November 2009, C.H. Robinson employee Robyn Kippley prepared an employment summary, reviewed it for accuracy with Bowers, and then forwarded it to LINA.  Id. at 1212.  On December 21, 2009, LINA

---

[2] The parties filed the Administrative Record under seal.

approved Bowers's claim for LTD benefits, finding his disability to have started on December 27, 2007. Id. at 401.

**B. Waiver-of-Premium Benefits**

In addition to LTD benefits, the Plan provides employees with life insurance coverage through a policy issued by LINA (the "Life Policy"). Id. at 1825-57. The Life Policy divides employees into three classes, and states that a Class 2 Employee will only qualify for the life insurance benefit if he has been "regularly working a minimum of 30 hours per week." Id. at 1827. The parties agree C.H. Robinson categorized Bowers as a Class 2 Employee.

The Life Policy waives the payment of premiums (referred to as the "WOP" benefit) for employees qualified as "disabled." An employee is "disabled" under the Life Policy when the employee "is unable to perform the material and substantial duties of his or her occupation" due to injury or sickness. Id. at 1855. This is referred to as the "own occupation" standard of disability. After 12 months, however, the employee will only continue to be considered "disabled" if "he or she is unable to perform the material and substantial duties of any occupation for which he or she is or may reasonably become, qualified for." Id. at 1855 (emphasis added). This is often referred to as the "any occupation" standard, or "total disability." After a 180-day "Benefit Waiting Period," an employee qualifying for the WOP benefit receives coverage under the Life Policy without paying premiums, and the coverage continues until the employee is no longer disabled or a maximum benefit period is reached. See id. at 1842.

    **1. Initial Claim**

In December 2009, the same month LINA approved LTD benefits, Bowers also applied

for the WOP benefit.  On January 19, 2010, LINA approved Bowers's claim in part.  Id. at 384-85.  LINA agreed Bowers retroactively qualified for the WOP benefit from June 27, 2008, until December 26, 2008.  Id.  LINA concluded Bowers first became "disabled" under the "own occupation" standard when he left work for his quadruple bypass surgery on December 26, 2007.  The 180-day "Benefit Waiting Period" then delayed Bowers's WOP benefit until June 27, 2008, at which time it applied until December 26, 2008.  Id.  At that point, however, LINA essentially concluded that Bowers had fallen in the coverage gap between "totally disabled" and regular "employee."  See id.  After 12 months under the "own occupation" standard of "disability," the Life Policy moved to the "any occupation" standard.  Because Bowers had returned to work as a sales consultant by this time, he did not qualify as "disabled" under the "any occupation" standard.  At the same time, LINA concluded Bowers had not been "regularly working a minimum of 30 hours per week," meaning Bowers had not met the basic life insurance eligibility requirements for Class 2 Employees.  LINA thus denied the remainder of Bowers's claim, finding Bowers had failed to demonstrate that he had re-established himself as a full-time employee able to claim Life Policy benefits.  Id.

**2. First Appeal**

On June 14, 2010, Bowers appealed his claim for the WOP benefit.  In his appeal letter, Bowers stated that when he initially returned to C.H. Robinson, he worked about 25 hours per week for "the first couple of months," after which he resumed a normal workload of 34.5 hours per week until the end of 2008.  Bowers also stated that he worked up to 45 hours per week when a deadline or other situation required it.  Id. at 1874.  Bowers also stated C.H. Robinson had categorized him as a full time employee, and that his supervisor, Gary Rogers, could confirm his

workload.  Id.; see also id. at 1880.  As a salaried employee, Bowers noted, no other documents or timesheets existed which might more specifically document his hours.  Id. at 1875.

As part of its review process, LINA's designated Appeal Specialist Rui Cuinha requested Bowers's workload information from C.H. Robinson.  C.H. Robinson confirmed that no timesheets or other specific documents existed, and referred LINA to documents prepared in connection with Bowers's LTD claim.  These documents included an "employment summary" written by C.H. Robinson employee Robyn Kippley.  Id. at 1212.  In the summary, dated November 17, 2009, Kippley wrote that C.H. Robinson and Bowers agreed he would "initially resume work on a part-time basis and work back up to a full time work load."  Id. at 1214.  Kippley noted Bowers was working "about 25 hours a week by Labor Day" in 2008, but Bowers continued to have "severe fatigue issues and cardiac symptoms."  Id.  In 2009, Kippley wrote, Bowers "attempted to further integrate a full-time role," but proved unable to do so by April 2009, at which point his health forced him to reduce his hours.  Id. at 1214.

Cuinha's report concluded Bowers was not eligible for the WOP benefit.  Cuinha wrote Bowers never returned to work full time, but instead had an agreement to receive full time compensation for part time work, with the difference in value being deducted from his bonus earnings.  Id. at 114.  To reach this conclusion, Cuinha reviewed the information sent by Bowers as well as Kippley's summary.  Id.  On October 8, 2010, LINA issued a formal letter notifying Bowers of its decision to deny his appeal.  Id. at 375.  LINA stated Bowers could request a second, voluntary appeal if he had different or additional information to submit.  Id. at 376.

### 3. Second Appeal and Litigation

On September 20, 2011, Bowers's counsel sent a letter to LINA enclosing a draft

complaint disputing LINA's denial of the WOP benefit. Id. at 586. LINA responded that it did not engage in pre-litigation settlement discussions, and again stated Bowers could file a voluntary second appeal. Id. at 581.

On February 25, 2012, Bowers filed the voluntary appeal, to which he attached an affidavit. Bowers's affidavit largely restated his initial claim: he began working at 25 hours per week, but increased this to 34.5 hours in a "couple of months," and worked more if necessary. Id. at 511. Bowers also submitted his 2008 year-end review, in which he stated, "I plan on being back full-time by mid-December." Id. at 522. Also in the review, Bowers wrote he was continuing his therapy at this time, and that he planned to start work at 9:00 a.m. three days per week, and he intended to work until 5:30 or 6:00 p.m. on these days as an "offset." Id. On the remaining two days, Bowers planned to start work at 7:30 a.m. Id. at 522. In his affidavit, Bowers stated that this year-end review proved he had worked "well over 30 hours per week" in 2008, and that he worked even more hours in 2009. Id. at 512. Bowers also denied Cuinha's conclusion that C.H. Robinson had agreed to allow Bowers to work part time while receiving a full time salary. Id.

On April 4, 2012, Bowers submitted the affidavit of Gary Rogers, his supervisor at C.H. Robinson. Rogers confirmed that when Bowers initially returned to the company, he worked "half days on a reduced schedule," but "worked on average 30 hours per week" by the end of 2008. Rogers stated that Bowers worked "on average 30 hours per week" until he left in June 2009. Id. at 1184.

Appeal Specialist Ryan Smith reviewed Bowers's voluntary appeal, and again concluded Bowers was not eligible for the WOP benefit. Like Cuinha, Smith relied primarily on Kippley's

employment summary in finding Bowers had been working approximately 25 hours per week, and thus did not qualify as an eligible employee. Id. at 77. On May 11, 2012, Smith sent a letter to Bowers informing him of LINA's denial of his second appeal. Id. at 1183.

On April 17, 2013, Bowers filed this action. He alleges four claims against LINA, for: (1) violating ERISA by failing to grant Bowers the WOP benefit from June 2009 to the present; (2) violating ERISA for failing to return the premiums Bowers paid from June 2008 until December 2008; (3) breach of fiduciary duty; and (4) attorney's fees. Compl. ¶¶ 59-72.

### III. DISCUSSION

**A. Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (citations omitted). If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. Id. However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted).

**B. ERISA Standard of Review**

A plan beneficiary challenging the denial of benefits under 29 U.S.C. § 1132(a)(1)(B) is entitled to de novo review of his claim "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Because it is "relatively easy for an insurer to use unambiguous discretion-conferring language," when an insurance policy uses ambiguous claims submission language, "the presumption should be there was no intent to confer such discretion." Walke v. Grp. Long Term Disability Ins., 256 F.3d 835, 840 (8th Cir. 2001).  Only "explicit discretion-granting language" will trigger the deferential standard of review.  Hankins v. Standard Ins. Co., 677 F.3d 830, 835 (8th Cir. 2012).

In determining whether a plan grants the administrator discretion, the summary plan description (or "SPD") should also be consulted.  Under 29 U.S.C. § 1022(a), the SPD must use "plainspoken" language to inform plan beneficiaries of their rights and obligations under the plan. Jobe v. Med. Life Ins. Co., 598 F.3d 478, 483 (8th Cir. 2010).  The SPD should generally prevail when it conflicts with plan language, because beneficiaries are more likely to read and understand the SPD, and ERISA places importance on disclosing plan information to beneficiaries.  Id.  However, where the SPD purports to enlarge the administrator's rights at the expense of plan participants, the SPD does not prevail.  The SPD must be an accurate summary of beneficiary rights, "not an unnegotiated enlargement of the administrator's authority." Ringwald v. Prudential Ins. Co. of Am., 609 F.3d 946, 949 (8th Cir. 2010) (quoting Schwartz v. Prudential Ins. Co. of Am., 450 F.3d 697, 699-700 (7th Cir. 2006)).  Thus, if a plan lacks discretion-granting language altogether, the SPD cannot by itself confer such discretion.

However, if the plan has an "arguably ambiguous grant of discretion," the SPD must be interpreted in harmony with the plan, and may clarify the ambiguity. Prezioso v. Prudential Ins. Co. of Am., No. 13-1641, 2014 WL 1356862, at *4 (8th Cir. Apr. 4, 2014).

The LINA Life Policy does not include explicit discretion-granting language. The Life Policy states in relevant part:

> In order to qualify for Waiver of Premium an Employee must submit due proof that he or she has been Disabled for the Benefit Waiting Period shown in the Schedule of Benefits for this benefit. . . . Premiums will be waived from the date the Insurance Company agrees in writing to waive premiums for that Employee. After premiums have been waived for 12 months, they will be waived for future periods of 12 months, if the Employee remains Disabled and submits satisfactory proof that Disability Continues. Satisfactory proof must be submitted to the Insurance Company 3 months before the end of the 12 month period.

Admin. Record at 1842. Phrases such as "due proof" and "satisfactory proof," the Eighth Circuit has held, are "common in insurance policies" and insufficient to explicitly confer discretion. Bounds v. Bell Atl. Enterprises Flexible Long-Term Disability Plan, 32 F.3d 337, 339 (8th Cir. 1994) (finding phrase "after [administrator] receives adequate proof of loss" did not confer discretion); see also Walke, 256 F.3d at 839-40 (holding phrase "satisfactory proof of Total Disability," without more, would not confer discretion).

The Life Policy language also differs from the discretion-conferring language reviewed by the Eighth Circuit in Prezioso. There, the plan stated the beneficiary had to submit proof of continuing disability "satisfactory to Prudential." Prezioso, 2014 WL 1356862, at *4. In such cases, the submitted evidence must specifically satisfy the plan administrator, thus unambiguously reflecting discretion. Id.; see also Ferrari v. Teachers Ins. & Annuity Ass'n, 278 F.3d 801, 806 (8th Cir. 2002). Here, the Life Policy includes no such language. Nor does the

9

Life Policy use similar language in a way that might create ambiguity.  See, e.g., Walke, 256 F.3d at 840 (finding placement of phrase "to us" in relationship to word "satisfactory" created ambiguity).

The only language LINA argues confers discretion relates to the effective dates of the life insurance and WOP benefit.  In the first instance, the Life Policy states the effective date of insurance will be "on the date the Insurance Company agrees in writing to insure that eligible person."  Admin. Record at 1840.  Similarly, in the second instance, the Life Policy states the waiver of premiums will begin "from the date the Insurance Company agrees in writing to waive premiums for that Employee."  Id. at 1842.  The phrase "agrees in writing," LINA argues, empowers LINA to decide whether to insure Bowers, and then whether to grant the WOP benefit.

This reading of the Life Policy language entirely ignores the context of the phrase.  In both instances, the sentences address when a benefit begins, not whether a benefit applies at all. The use of the phrase "in writing" does no more than further emphasize this point.  The instances in which a legal consequence is conditioned on the delivery of written notice are legion.  To argue that a provision regarding the delivery of written notice implicitly grants discretion contradicts both common sense and basic contract interpretation principles.  See Jacobs v. Pickands Mather & Co., 933 F.2d 652, 657 (8th Cir. 1991) (holding ERISA plan interpretation is "simply one of contract interpretation") (quotations omitted).  As such, this language does not unambiguously, or even ambiguously, confer discretion to LINA.

LINA also argues the SPD confers discretion.  The SPD states LINA "shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for

coverage or benefits under the Plan, and to make any related findings of fact." Admin. Record at 1979. If the Life Policy was ambiguous as to whether it conferred discretion to LINA, this SPD language may have resolved the ambiguity in LINA's favor. Because the Life Policy is not ambiguous, however, the SPD cannot by itself confer discretion to LINA at beneficiaries' expense. See Ringwald, 609 F.3d at 949. As the SPD itself states, "This is not the insurance contract. It does not waive or alter any of the terms of the Policy. If questions arise, the Policy will govern." Id. at 1955. Here, the Life Policy does not expressly confer discretion, and so Bowers's claim is reviewed using the de novo standard of review.

**C. Bowers's Waiver-of-Premium Benefit**

Under the de novo standard of review, the court interprets "the terms of the plan by 'giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'" Adams v. Continental Cas. Co., 364 F.3d 952, 954 (8th Cir. 2004) (quoting Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 790 (8th Cir. 2002)). When "a district court conducts a de novo review of an ERISA fiduciary's denial of benefits," the Eighth Circuit customarily reviews those findings under the "clearly erroneous" standard. Reid v. Conn. Gen. Life Ins. Co., 17 F.3d 1092, 1098 (8th Cir. 1994).

The pivotal dispute centers on the number of hours Bowers was working per week when he left C.H. Robinson, and whether the hours worked placed Bowers in the "Class of Eligible Employees" under the Life Policy. As discussed above, Bowers initially qualified as "disabled" under the "own occupation" definition of disability for 12 months, and continued to be considered disabled after he returned to work in a reduced capacity. After the 12 month period

ended on December 26, 2008, Bowers stopped qualifying as "disabled" because he did not satisfy the "any occupation" definition of disability. Without continuous disability, Bowers ceased to be eligible for the WOP benefit and had to re-establish himself as an eligible employee. As a result, Bowers's only avenue to qualify for the WOP benefit is by demonstrating that when he left work in June 2009, he left as a full-time employee "regularly working a minimum of 30 hours per week." Id. at 1827.

The only evidence documented in the record specifically addressing Bowers's work schedule demonstrates Bowers regularly worked at least 30 hours per week. As part of his voluntary appeal, Bowers testified in an affidavit dated February 24, 2012, that while he initially worked 25 hours per week, he increased his workload to 34.5 hours per week after the first "couple of months," and continued to work full time until he left in June 2009. Id. at 509-19. He also stated that he occasionally worked up to 45 hours per week when required. Id. at 511. This testimony is consistent with Bowers's first appeal. Id. at 1874. Kippley of C.H. Robinson corroborated this statement in an email dated September 18, 2009, in which she wrote, "It looks like when [Bowers] returned, he worked anywhere from 25-40 hours per week for awhile [sic]." Id. at 1198. Also as part of his voluntary appeal, Bowers submitted an affidavit from his supervisor Gary Rogers. Rogers testified that by the end of 2008, Bowers "worked an average of 30 hours per week," and that until June 2009, Bowers maintained this workload. Id. at 1268-69.

The medical evidence of record suggests Bowers struggled with fatigue and chronic pain, but also supports Bowers's position. On October 8, 2008, Bowers's physician, Dr. Carmelo J. Panetta, wrote Bowers was attending rehabilitation therapy four days per week, after which he worked "until 2 or 3 in the afternoon and then he is extremely fatigued and he has to go to

sleep." Id. at 1483.  This is consistent with Bowers's own affidavit and Kippley's employment summary, in which Kippley wrote Bowers returned to work on a reduced schedule.  By December 30, 2008, Bowers's physician Dr. Robert Tierney wrote Bowers worked for "30 hours maximum a week.  He might work an eight hour day but if he does he is markedly fatigued.  I think this is remarkable for what he has been through."  Id. at 1479.  Dr. Tierney noted that "Overall, I am delighted with how [Bowers] is doing."  Id. at 1480.  This assessment is again consistent with Bowers's affidavit and Kippley's summary, both of which stated Bowers increased his workload over time.  It also corroborates Bowers's affidavit and his 2008 performance evaluation, in which Bowers wrote he intended to be "back full-time" by the end of the year.  Id. at 522.

      Although Bowers's medical records suggest Bowers faced increasing health problems in 2009, they nevertheless support a finding that Bowers continued working 30 hours per week.  On February 2, 2009, Dr. Panetta wrote Bowers was "still having problems with fatigue. . . . He says that he gets exhausted between 3 and 4:30.  It is very difficult for him to walk."  Id. at 1476.  Nevertheless, on March 16, 2009, Dr. Panetta wrote that although Bowers experienced "awful" fatigue, "it is slowly improving."  Id. at 1472.  On April 2, 2009, Dr. Harold Martin wrote Bowers reported his life quality as being affected by "chronic pain," that Bowers's "[s]ternum is made worse with any movement."  On the same day, Dr. Salim Kathawalla again noted Bowers's extreme fatigue, but wrote that Bowers "generally works from about 9 o'clock until about 4 (30 hours a week)."  Id. at 1466.  Although Bowers's medical records continue to record Bowers's fatigue and chronic pain, Bowers's doctors made no further comments regarding his workload.  The evidence of record demonstrates Bowers worked at least 30 hours per week until June 2009.

LINA attempts to avoid this conclusion primarily by relying on Kippley's employment summary, but the summary does not contradict the record with any specificity. In 2009, Kippley wrote, Bowers "attempted to integrate a full-time role" in his division but was unable to do so, and he "cut back" his workload in April. Id. at 1214. But Kippley never indicated whether a "full-time role" meant 40 hours per week—a common standard—or 30 hours per week.[3] Nor did Kippley estimate what Bowers's weekly workload was at any point in 2009. Kippley's general summary is largely consistent with Bowers's affidavit and medical records: although Bowers may have increased his hours by the end of 2008 or early 2009 to between 30 and 40 hours per week, Bowers reduced them in April 2009 and was working 30 hours per week when he left his employment. LINA also cites a note written by Dr. Panetta on April 29, 2009, in which the doctor wrote Bowers's "quality of life has been very poor, forcing him to stop working because of his chronic pain." Id. at 1455. But LINA does not dispute that Bowers's last day of work was June 13, 2009, meaning Dr. Panetta's comment is either mistaken or taken out of context. Finally, LINA cites a letter sent by Bowers's former counsel in connection with Bowers's LTD claim, in which counsel wrote Bowers "was only able to work about 25 hours per week due to his ongoing disability." Id. at 1196. Bowers did work about 25 hours per week upon his return to C.H. Robinson, but his counsel's letter does not reflect the record as a whole, which establishes Bowers increased his workload as the year progressed.

Given the evidence Bowers has cited from the Administrative Record, LINA's cited case

---

[3] The Life Policy defines "Full-Time" as "the number of hours set by the Employer as a regular work day for Employees in the Employee's eligibility class." Admin. Record at 1856. Neither party submits evidence of what C.H. Robinson deemed to be "Full-Time" for Class 2 employees. As discussed above, the Life Policy only required a Class 2 Employee to be "regularly working a minimum of 30 hours per week." Admin. Record at 1825-57.

law does not apply here.  LINA cites <u>Hofferber v. Cigna Life Ins. Co.</u>, No. 03-74161, 2006 WL 846761 (E.D. Mich. Mar. 31, 2006), as an example of where a claimant's "bare assertion" of full-time status did not warrant eligibility for plan benefits.  Unlike in that case, Bowers has submitted and cited evidence substantiating his claim.  And although LINA argues that Bowers's affidavit is self-serving, "[m]ost affidavits are self-serving."  <u>Wilson v. McRae's, Inc.</u>, 413 F.3d 692, 694 (7th Cir. 2005).  What gives Bowers's affidavit value in this case, however, is that it is based on personal knowledge; arguably, no one knew Bowers's work schedule better than he.  And the record as a whole—including statements from C.H. Robinson employees—corroborates Bowers's testimony.  <u>See</u> Admin. Record at 1198 (Kippley's September 18, 2009 email), 1268 (Rogers's affidavit).  Thus, the evidence in this case distinguishes it from cases where a claimant relied on bare assertions, or where the record clearly disproved a claim of eligibility.  <u>See, e.g.</u>, <u>Atrix Int'l, Inc. v. Hartford Life Grp. Ins. Co.</u>, No. 06-4140, 2008 WL 151614, at *9 (D. Minn. Jan. 15, 2008) (affirming administrator's denial where claimant stated he spent 30 hours per week "thinking and planning" for employer, despite total lack of evidence in support); <u>see</u> <u>Fink v. Union Cent. Life Ins. Co.</u>, 94 F.3d 489, 491-92 (8th Cir. 1996) (finding administrator had uncovered "overwhelming evidence" that claimant was not working full-time).

**D.  Amount of Life Insurance Benefit**

Assuming the WOP benefit has continued his coverage under the Life Policy, Bowers argues LINA has miscalculated the amount of his life insurance coverage.  The Life Policy provides a basic life insurance benefit equal to the employee's "Annual Compensation."  Admin. Record at 1832.  "Annual Compensation" is determined by an employee's salary as of April 1 of each year, plus any bonuses or other compensation earned in the 12 months prior.  <u>Id.</u> at 1855.

The amount determined to be an employee's "Annual Compensation" is updated on May 1 of ever year. Id. at 1855. The parties agree Bowers elected to receive supplemental coverage under the Life Policy, meaning his life insurance benefit is equal to five times his Annual Compensation. See id. at 508, 1899.

The parties disagree, however, as to the amount of coverage. Bowers argues he is entitled to coverage of $993,000. In support of this argument, Bowers identifies certain captured images from C.H. Robinson's payroll software, which depict basic coverage of $193,000 and supplemental coverage of $800,000, for a total life insurance benefit of $993,000. Admin. Record at 1303, 1895. Conversely, LINA argues C.H. Robinson updated Bowers's "Annual Compensation" amount on May 1, 2009, one month before Bowers stopped working. At that time, based on Bowers's reduced bonus earnings, C.H. Robinson determined Bowers was eligible for coverage of $634,000. Id. at 1304. At oral argument, LINA also argued that if Bowers was entitled to the WOP benefit, the matter should be remanded to LINA for a final determination of Bowers's coverage.

The record is unclear as to what the proper amount of coverage should be. LINA is correct that Bowers's "Annual Compensation" should have been updated on May 1, 2009, and that Bowers's compensation as of that date should determine the final amount of his coverage. Yet neither party acknowledges that both C.H. Robinson and Bowers himself stated additional, competing amounts of "Annual Compensation." In her employment summary, Kippley wrote that Bowers's base salary was $100,000 after his return to work, and that Bowers actually earned a $12,000 bonus in 2008. Id. at 1214. And Bowers wrote in his own affidavit that he was only eligible for a $10,000 bonus in 2008. Id. at 511. Neither of these amounts would lead to the

competing coverage amounts suggested by the parties. As a result, this matter shall be remanded to LINA for determination. See, e.g., McDonel v. Hartford Life & Accident Ins. Co., No. 10-4510, 2012 WL 2395191, at *10 (D. Minn. June 25, 2012) (remanding benefits case for further administrative review); see also Abram v. Cargill, Inc., 395 F.3d 882, 887 (8th Cir. 2005) (holding district court must remand case when ERISA plan administrator "fails to make adequate findings or explain the rationale for its decision").

**E. Return of Paid Premiums**

For his second ERISA claim, Bowers alleges he should be refunded the Life Policy premiums he paid while disabled but still working for C.H. Robinson. LINA retroactively found Bowers was eligible for the WOP benefit from June 27, 2008, until December 26, 2008, but it did not return Bowers's premium contributions. LINA now argues that the Life Policy is a contract between itself and C.H. Robinson, and that Bowers must seek reimbursement from C.H. Robinson.

LINA's argument is only partially persuasive. C.H. Robinson paid a premium to LINA to grant Bowers basic life insurance coverage under the Life Policy. Bowers does not have standing to recover the amounts contributed in this regard. However, as discussed, Bowers also opted for supplemental coverage, payment for which he was solely responsible. Admin. Record at 529. C.H. Robinson withheld the supplemental premium payments on Bowers's behalf, but ultimately this payment was made by Bowers to LINA. As such, LINA must return the supplemental coverage premiums Bowers paid from June 27, 2008, until December, 26, 2008. See, e.g., Derksen v. CNA Grp. Life Assurance Co., No. 04-3411, 2006 WL 1877072, at *4 (D. Minn. July 6, 2006); Gibson v. Alcoa, Inc., No. 08-CV-1039, 2011 WL 3876169, at *2 (W.D.

Ark. Aug. 31, 2011).

**F. Fiduciary Duty**

In addition to his ERISA claims, Bowers alleges LINA breached its fiduciary duty by improperly evaluating his claim for the WOP benefit. If no financial conflict of interest exists, a plan beneficiary must demonstrate a serious "procedural irregularity" to establish a breach of duty. See Anderson v. U.S. Bancorp, 484 F.3d 1027, 1033 (8th Cir. 2007). Bowers has not identified the sort of serious irregularity establishing a breach of fiduciary duty. Further, Bowers's claim for breach of fiduciary duty is identical to his ERISA claims, and ERISA alone provides the remedy in such circumstances. See Sahulka v. Lucent Techs., Inc., 206 F.3d 763, 768 n.9 (8th Cir. 2000) ("Section 1132(a) provides the exclusive causes of action for claims by ERISA plan participants and beneficiaries seeking to enforce rights under an ERISA plan."). Bowers's claim for breach of fiduciary duty is dismissed.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1. Plaintiff Mark S. Bowers's Motion for Summary Judgment [Docket No. 28] is **GRANTED**.

2. Defendant Life Insurance Co. of North America's Motion for Summary Judgment [Docket No. 22] is **DENIED**.

3. This matter is **REMANDED** to Defendant Life Insurance Co. of North America for the following matters:

    a. Determining the amount of Plaintiff's coverage under the Life Policy as of June 13, 2009; and

    b. Calculating and returning the premiums paid by Plaintiff to Defendant for supplemental coverage from June 27, 2008, until December 26, 2008.

4. Defendant shall have 30 days from the date of this Order to address the matters on remand, after which it shall file a one-page letter notifying the Court and Plaintiff of its determinations.  Within 14 days, Plaintiff may respond by memorandum to Defendant's findings and also address the issue of attorney's fees, should Plaintiff decide to seek them and the parties cannot resolve the issue on their own.  Defendant shall have 14 days to respond to Plaintiff's memorandum.  The party's memoranda shall not exceed 5,000 words each.

BY THE COURT:

　　　s/Ann D. Montgomery　　　
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 14, 2014.